

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00195-CR

———————————————————

CHRISTOPHER GADSDEN, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 5
Tarrant County, Texas
Trial Court No. 1644138

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

A jury found Appellant Christopher Gadsden guilty of assault causing bodily injury. Following the jury's verdict, the trial court made a finding of family violence and sentenced Gadsden to 250 days in jail and a $500 fine. The trial court suspended imposition of imprisonment and placed Gadsden on probation for twenty months. Gadsden now appeals his conviction.

In two points of error, Gadsden contends the trial court abused its discretion by (1) admitting extraneous-offense evidence as relationship evidence under Article 38.371, *see* Tex. Code Crim. Proc. Ann. art. 38.371, because the evidence did not comply with Rules 404(b) and 403, *see* Tex. R. Evid. 403, 404(b), and (2) admitting expert testimony and exhibits related to the dynamics of domestic violence because the evidence was not sufficiently tied to the facts of the case to be relevant to aid in the jury's decision, *see* Tex. R. Evid. 702. We hold that the trial court did not abuse its discretion by admitting the challenged evidence or by allowing the expert testimony and exhibits; we therefore affirm the trial court's judgment.

## I. Background[1]

On November 5, 2019, Gadsden's wife, Heidi,[2] drove Gadsden to the Dallas–Fort Worth airport for his flight to Mexico. Gadsden and Heidi's adopted daughter,

---

[1]Because Gadsden does not challenge the sufficiency of the evidence to support his conviction, we omit a more detailed factual background and will set forth additional facts as necessary in our discussion.

[2]Aliases have been used for Gadsden's wife and their minor child. *See* Tex. R.

Gia, was also in the vehicle. That morning, Gadsden, Heidi, and Gia left their house before sunrise; it was dark and had been raining. As they entered the airport premises, there was a physical altercation in the vehicle between Heidi and Gadsden. Heidi later filed a police report alleging that Gadsden had assaulted her. When he returned from his trip to Mexico, Gadsden was arrested at the airport and charged with family-violence assault. At Gadsden's trial, Heidi's and Gadsden's testimonies regarding the assault contradicted each other.

Heidi testified that on the morning she drove Gadsden to the airport, it had been dark and raining, and she had to drive through busy traffic and road construction. Because of the dangerous driving conditions, Heidi drove cautiously. As they entered the airport's toll road, Heidi pulled up to a toll booth to retrieve a ticket, and in doing so, she "slightly scratched" the driver's side mirror of the vehicle. Gadsden then began punching Heidi in her right arm, cursing at her, and calling her stupid. Heidi testified that Gadsden hit her several times. Heidi then dropped Gadsden off at the terminal, and as he left the vehicle, he told Heidi that he never wanted to see her again and that Gia could "go to hell."

Gadsden, on the other hand, testified that Heidi had been upset with him that morning because she did not want him to go back to Mexico. Gadsden described Heidi's demeanor as "very angry." On the way to the airport, Heidi began speeding, weaving in and out of traffic, accelerating suddenly, and slamming on the brakes to

App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

3

"spite" him. Gadsden told Heidi to slow down several times. As they approached the airport toll booth, Heidi slammed on the brakes, and in the process, the driver's side mirror hit the concrete post. When Heidi struck the toll booth, Gadsden reached over and "grabbed" her arm and told her to slow down because she was "going to kill [them]." Gadsden testified that he never hit or punched Heidi but that it was "quite possible" he could have bruised her arm when he reached over to grab her because she "has always bruised very easily."[3] He also testified that Heidi had hit him as he got out of the car at the terminal. Heidi "snickered" at Gadsden and told him that he was going to go to jail and that she would get custody of Gia.

The State gave notice that it intended to introduce evidence at trial to show the relationship between Heidi and Gadsden, including Heidi's testimony that Gadsden (1) had been controlling Heidi throughout the relationship; (2) had isolated her from her friends and family; (3) had physically abused her several times throughout the relationship; (4) had choked her; (5) had punched her; (6) had pushed her down the stairs; (7) had forced her to perform sexual acts; (8) had threatened her with immigration consequences involving their daughter, who they were adopting from Mexico; (9) had sent harassing messages to Heidi; and (10) had threatened to kill Heidi. The State also sought to introduce evidence that the physical violence had increased in severity or frequency in the year before the November 5, 2019 assault and

---

[3]During Heidi's testimony, the State entered photos of Heidi's bruises into evidence. Heidi testified that during the week following the assault, she had taken those photos of her arm—where Gadsden had punched her—that show the progression of her bruising.

4

that Gadsden had physically assaulted Gia on at least one occasion when he slapped her in the face.

At trial, Gadsden objected to the admission of the evidence under Rules 403 and 404(b). The trial court determined that under Article 38.371(b), evidence of the nature of the relationship between Gadsden and Heidi was admissible and overruled Gadsden's objection. However, the trial court clarified that Heidi could testify only about her relationship with Gadsden and not about his relationship with their daughter; any testimony related to the allegation that Gadsden had slapped Gia across the face was inadmissible. The trial court then issued a limiting instruction in the written jury charge:

> You are further charged that if there is any evidence before you in this case tending to show that [Gadsden] committed a crime, wrong, or act other than the offense alleged in the information, you cannot consider said evidence for any purpose unless you first find and believe beyond a reasonable doubt that [Gadsden] committed said crime, wrong[,] or act. If you find and believe beyond a reasonable doubt that [Gadsden] committed the crime, wrong[,] or act, you may then consider the same in determining the purpose for which it was introduced, namely, the nature of the relationship of the parties, and for no other purpose.

In addition to the extraneous-offense evidence, the State sought to introduce the expert testimony of Lacy Hensley regarding the dynamics of domestic violence. When the State tendered Hensley as an expert at trial, Gadsden objected under Rule 702 and argued that "the dynamics of domestic violence" was not a subject matter requiring scientific or technical knowledge for which a jury would need the assistance of an expert. The trial court overruled the objection and allowed the testimony.

5

Hensley testified generally about domestic violence and more specifically about the cycle of violence, which describes the three cyclic phases of an abusive relationship, and power and control, which explains the different ways in which an abuser may maintain power and control over their victim. To aid in Hensley's testimony, the State offered the power-and-control wheel and the cycle of violence as demonstrative exhibits, and Gadsden objected to relevance and hearsay. The trial court overruled the objections and admitted both exhibits for demonstrative purposes.

## II. Discussion

### A. Standard of Review

We review the trial court's admission of evidence for an abuse of discretion, and we will uphold the trial court's decision so long as it falls within the "zone of reasonable disagreement" and is correct under any theory of law applicable to the case. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Merrick v. State*, 567 S.W.3d 359, 375 (Tex. App.—Fort Worth 2018, pet. ref'd); *Pettigrew v. State*, No. 02-14-00494-CR, 2016 WL 7405792, at *5 (Tex. App.—Fort Worth Dec. 22, 2016, pet. ref'd) (mem. op., not designated for publication). We also review a trial court's ruling on an expert's qualifications for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). We will uphold the trial court's correct decision under any applicable legal theory even if the trial court gave a wrong or incomplete reason for its ruling. *De La Paz v. State*,

6

279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

## B. Admissibility of Evidence of Extraneous Offenses

In his first point of error, Gadsden complains about the trial court's admission of the State's evidence proffered under Article 38.371 of the Code of Criminal Procedure. He argues that the extraneous-offense evidence was offered to show Gadsden's character conformity in violation of Rule 404(b) and that the probative value of the evidence was substantially outweighed by a risk of undue prejudice, confusing the issues, and misleading the jury, in violation of Rule 403. *See* Tex. R. Evid. 403, 404(b).

### 1. The Extraneous-Offense Evidence

At trial, the jury heard extraneous-offense evidence through Heidi's testimony, who testified about her relationship with Gadsden and his history of abuse. Heidi testified that she and Gadsden got married in 2007 and that Gadsden became verbally abusive shortly thereafter. Specifically, Gadsden began yelling and cursing at Heidi in 2007, and he would "twist things around" on her. Heidi and Gadsden eventually decided to adopt a baby from Mexico, and when Gia was born, Heidi began traveling back and forth to Mexico to be with Gia. While Heidi was in Mexico with Gia, Gadsden would call Heidi to curse at her and tell her to come home to do his laundry. On one occasion when Heidi was home, Gadsden cursed at her and pushed her down the stairs while she was carrying a hamper of dirty laundry. On another occasion when

Heidi came home to surprise Gadsden, he became angry and slapped her across her cheek.

Gadsden and Heidi eventually moved to Mexico together to be with Gia, and the abuse worsened. Gadsden began drinking, and he would push, shove, and slap Heidi. Heidi ultimately became Gadsden's "servant," and Gadsden would force her to perform sexual acts she did not want to do and "wear things" she did not want to wear. Heidi testified that, although she had considered leaving Gadsden while they lived in Mexico, she stayed with him because (1) he had threatened to report her to immigration services and said he would accuse her of kidnapping Gia and (2) she had been alone and felt she did not have any support.

In July 2019, Gadsden, Heidi, and Gia moved to Texas from Mexico, and Gadsden continued to travel back and forth between Texas and Mexico for his business. Heidi testified that the abuse occurred even when Gadsden was in Mexico. She described Gadsden as controlling; he controlled her access to finances, and she always had to ask him for permission to use money. While he was gone, he controlled her life through abusive messages and abusive phone calls. When he would return from Mexico, he would check the mileage on the vehicle he allowed her to drive to see how far she had driven while he was gone.

During Heidi's testimony, the State entered evidence of "screen shots" of messages that Gadsden had sent to Heidi via the texting application, WhatsApp. On November 17, 2019—after the alleged assault—Gadsden wrote

Heidi answer the phone . . . . If you want [Gia] to get her paper answer or I swear to [expletive] God I will call the attorney tomorrow and tell them I don't want to continue with [Gia's] case and she will be deported . . . . [E]ither you answer the phone[,] or it will be a very bad day for you tomorrow[.]

After Heidi received several missed phone calls from Gadsden, Gadsden threatened Heidi again: "There are going to be complicated and serious issues when I stop [Gia's] case[. S]he will be deported . . . . [I]s that what you want?" The next day, Gadsden apologized to Heidi: "Look I'm really sorry and was way out of line, and can never be undone, and I will pay for it for the rest of my life[.]" A few days later, after more missed phone calls, Gadsden told Heidi that they were both abusers:

Wow really so you're throwing it all away? Oh and when you say "abuse" please check the Texas def[i]nition[.] I'll email it to you but it includes "willful destruction of property" ie [sic] the car mirror[,] so I have a counter so we both are abusers[.] [W]hat do you think is going to happen to [Gia]?

Heidi testified that she was not an abuser. She stated that to Gadsden, the most important thing in his life was his vehicle.

Heidi testified that before the November 5, 2019 assault, she had not reported any of Gadsden's abuse to the police because he would threaten her and tell her that he would not complete Gia's adoption process, which would prevent Gia from entering the United States. She decided to report the November 5, 2019 assault because it was the first time Gadsden had hit her in front of Gia, and she did not want Gia to grow up thinking that kind of behavior was acceptable. But Heidi did not immediately call the police after the assault. She testified that at first, she did not want

9

to report it because she was "very scared." Heidi did not report the assault until that night.[4]

### 2. Admissibility under Rule 404(b) and Article 38.371

Rule 404(b) precludes the admission of evidence of a crime, wrong, or other act solely to prove a person's character to show that he acted in conformity with that character on a particular occasion. Tex. R. Evid. 404(b). However, the evidence may be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* "Those listed purposes 'are neither mutually exclusive nor collectively exhaustive.'" *James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.) (quoting *De La Paz*, 279 S.W.3d at 343); *see also Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006) ("Based on the clear language of the Rule, this list is not exhaustive."). Indeed, Rule 404(b) limits character evidence but is nevertheless a rule of inclusion. Tex. R. Evid. 404(b); *De La Paz*, 279 S.W.3d at 343; *James*, 623 S.W.3d at 545.

Article 38.371 of the Code of Criminal Procedure provides another non-character-conformity purpose for admitting extraneous-offense evidence, which is evidence of "all relevant facts and circumstances" that may assist a trier of fact in a family-violence prosecution. Tex. Code Crim. Proc. Ann. art. 38.371. It expressly allows extraneous-offense evidence regarding the nature of the relationship between

---

[4]At trial, Heidi's sister testified that she had seen the bruises on Heidi's arm when Heidi picked Gia up from her house that evening. She then told Heidi that "it was time. It was already so many years going through that stuff." Heidi reported the assault that night.

an accused and a complainant. *See id.* (allowing evidence to help determine "whether the actor committed the offense . . . , including testimony or evidence regarding the nature of the relationship"); *James*, 623 S.W.3d at 545–46 (similar); *Franco v. State*, No. 08-18-00040-CR, 2020 WL 3168560, at *8 (Tex. App.—El Paso June 15, 2020, no pet.) (not designated for publication) ("[T]he Legislature has determined under [A]rticle 38.371 that the nature of the relationship itself is a permissible, non-character-conformity purpose for which evidence is admissible." (citing *Fernandez v. State*, 597 S.W.3d 546, 564–66 (Tex. App.—El Paso 2020, pet. ref'd))); *Mourning v. State*, No. 02-19-00168-CR, 2020 WL 6165309, at *5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication).

Examples of admissible, extraneous-offense evidence that complies with Article 38.371 include evidence to rebut a defensive theory, to explain why a victim of domestic violence is reluctant to testify, to provide context for an otherwise isolated incident or outburst of violence, to describe the circumstances surrounding the relationship between the victim and the assailant at the time of the charged offense, or to simply contextualize the nature of the relationship between the victim and the assailant. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Garcia v. State*, 201 S.W.3d at 704; *Williams v. State*, No. 02-18-00382-CR, 2019 WL 2223214, at *3 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication); *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Notably, "[w]hether extraneous[-]offense evidence has relevance apart

from character conformity . . . is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Here, the trial court determined that the extraneous-offense evidence Gadsden complains of showed the nature of his relationship with Heidi pursuant to Article 38.371(b). We conclude it was well within the zone of reasonable disagreement for the trial court to have found in this case that the complained-of evidence was admissible for a non-character-conformity purpose. Indeed, the extraneous-offense evidence provided an explanation for Heidi's failure to immediately report the November 5, 2019 assault, so the trial court could have reasonably concluded that evidence of Gadsden's past assaultive behavior was necessary for the jury to understand why Heidi was "very afraid" to report the assault. *See Williams*, 2019 WL 2223214, at *3 (holding no abuse of discretion when trial court allowed extraneous-offense evidence of defendant's assault of the victim that had occurred more than ten years earlier, given victim's reluctance to testify against him). The trial court could have also concluded that the extraneous-offense evidence was necessary for the jury to understand the relationship between Gadsden and Heidi, the circumstances surrounding their relationship at the time of the assault, his motive for assaulting her on November 5, 2019, and his intent to commit the charged offense. *See id.* The evidence likewise could have been necessary to help the jury understand this otherwise isolated incident or outburst of violence. *See id.*

12

Further, during voir dire, defense counsel talked about the credibility of witnesses and discussed when and to what extent a juror must believe a witness's testimony. Gadsden then asserted—in his opening statement, his case in chief, and his closing argument—that he did not assault Heidi, as she had testified, but that he only grabbed her to stop her reckless and dangerous driving. Gadsden also cross-examined Heidi on her alleged speeding and reckless driving, and he obtained a jury charge on the law of necessity. Thus, the trial court could have reasonably concluded that Heidi's testimony of Gadsden's past assaultive conduct and the exhibits showing the text messages Gadsden had sent to Heidi after the assault—in which he threatened to have their daughter deported, apologized to Heidi, and conceded that he was an abuser—were admissible to rebut Gadsden's theory of necessity.

In addition, the trial court gave the jury a limiting instruction regarding the extraneous-offense evidence. "Without evidence to the contrary, we must presume that the jury followed the trial court's instruction." *Id.* (citing *Walker v. State*, 300 S.W.3d 836, 850 (Tex. App.—Fort Worth 2009, pet. ref'd)).

We therefore hold that the trial court did not abuse its discretion by admitting the extraneous-offense evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.371(b); Tex. R. Evid. 404(b); *James*, 623 S.W.3d at 546 (holding evidence concerning relationship between accused and complainant was admissible); *Mourning*, 2020 WL 6165309, at *4–5 ("The trial court therefore did not abuse its discretion by allowing the evidence . . . as it was relevant to explaining the nature of the[] relationship."); *Tran v. State*, No.

13

03-17-00155-CR, 2018 WL 3118464, at *3 (Tex. App.—Austin June 26, 2018, pet. ref'd) (mem. op., not designated for publication) ("We conclude that the trial court would not have abused its discretion by admitting testimony about the 1994 arrest under Rule 404(b) because the testimony was relevant to the relationship between [defendant] and his wife.").

### 3. Admissibility under Rule 403

Within his first point of error, Gadsden also argues that even if the extraneous-offense evidence is admissible under Rule 404(b), Rule 403 precludes its admission. Evidence admissible under Rule 404(b) may nevertheless be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

Rule 403 generally favors the admission of relevant evidence, and there exists a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996); *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). To overcome this presumption, the party opposing admission of the evidence must show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or by the other dangers listed in Rule 403. *James*, 623 S.W.3d at 547; *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd). Trial courts must conduct a balancing test when considering the admissibility of the evidence under Rule 403. *Gigliobianco v. State*,

14

210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 389. This test requires the trial court to consider (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence, and balance those factors against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42; *James*, 623 S.W.3d at 547.

### a. Probative Value and the State's Need for the Evidence

Probative value compares "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation . . . with the proponent's need for that item of evidence." *Gigliobianco*, 210 S.W.3d at 641. If the State has "other compelling or undisputed evidence to establish" what the extraneous-offense evidence "goes to prove," the value of the evidence is much less. *Id.* (relying on *Montgomery*, 810 S.W.2d at 390).

Gadsden contends the probative value of the extraneous-offense evidence was limited. Relying on *James*, he argues that the complained-of evidence does not have the same "closeness in time" or similarities to the charged offense as that in *James*, 623

15

S.W.3d at 547. In *James*, we held that "the timing of the offenses [was] key" because the complained-of evidence "concern[ed] acts that occurred during a period of less than four months" before James's arrest and "therefore had probative value as to his intent to commit the charged offenses." *Id.* We also held that the evidence was probative of the nature of James's abusive relationship with his victim, showing the patterns of abuse and the power and control that he had over her. *Id.* at 548. And it was probative to rebut the defensive theory of fabrication. *Id.*

Here, the extraneous-offense evidence was probative of the nature of Gadsden's abusive relationship with Heidi, showing the patterns of abuse and the power and control that he had over her. *See id.* While some of the prior assaults and abuse certainly did not occur "during a period of less than four months" before Gadsden's arrest, Heidi's testimony indicated that the abuse worsened over the years, which continued when they moved back to Texas in 2019—just months before this assault. And the exhibits showing the messages Gadsden sent to Heidi *after* the November 5, 2019 assault indicated that the abuse was ongoing. The complained-of evidence helped the jury understand why Heidi did not immediately report the November 5, 2019 assault, why she had not reported any of Gadsden's past abusive conduct, and why she had stayed with Gadsden. *See id.* It also helped the jury understand Gadsden's motive and his intent to commit the assault in this case, and it explained an otherwise isolated incident or outburst of violence.

16

Additionally, the extraneous-offense evidence was probative to rebut Gadsden's defensive theory that Gadsden did not punch Heidi, as Heidi testified, but that he grabbed her out of necessity. During voir dire, defense counsel talked about judging witness credibility and whether jurors must "believe everything that [a witness] says on the witness stand." In the defense's opening statement, defense counsel indicated that the case came down to the credibility of witnesses. He told the jury that they would hear "the rest of the story" from Gadsden, which would ultimately show that Heidi had lied about the assault and about her own behavior that morning. He conceded that "there was physical contact [and] pain" but contended that "there was a reason." He also told the jury that there was a reason Gadsden had not been able to "give his side of the story" until trial. And Gadsden obtained a jury charge on the law of necessity. Evidence of Gadsden's prior assaults and abuse makes it less likely that Gadsden merely "grabbed" Heidi out of necessity, i.e., to stop her alleged reckless and dangerous driving. *See id.*; *Foster v. State*, No. 01-17-00537-CR, 2018 WL 1914871, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2018, pet. ref'd) (mem. op., not designated for publication); *Martin v. State*, Nos. 02-07-309-CR–02-07-316-CR, 2008 WL 4831345, at *12–13 (Tex. App.—Fort Worth Nov. 6, 2008, pet. ref'd) (mem. op., not designated for publication). Therefore, the extraneous-offense evidence showed the jury that it was less likely that Gadsden left bruises on Heidi out of necessity.

For all these reasons, we hold that the probative value of the extraneous-offense evidence was strong. *See Upchurch v. State*, 656 S.W.3d 170, 179 (Tex. App.—Fort Worth 2022, no pet.); *James*, 623 S.W.3d at 548; *Foster*, 2018 WL 1914871, at *5; *Martin*, 2008 WL 4831345, at *12–13.

In evaluating the State's need for the evidence, "we consider (1) whether the proponent has other available evidence to establish the fact of consequence that the evidence is relevant to show, (2) the strength of the other evidence, and (3) whether the fact of consequence is related to an issue that is in dispute." *Upchurch*, 656 S.W.3d at 179 (citing *Erazo v. State*, 144 S.W.3d 487, 495–96 (Tex. Crim. App. 2004)). Here, the State had a strong need for the extraneous-offense evidence because Heidi and Gia were the only witnesses to the charged offense, and Heidi's credibility was implicitly at issue. *See James*, 623 S.W.3d at 548; *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication). Gadsden avers that the State should have called Gia—his own daughter—to testify as a witness. However, Gadsden argued to the jury that Gia was a missing witness and that the State's failure to call her to testify created a presumption that, even if she had testified, her testimony would not have helped the State's case. This argument implicitly supported the State's need for the extraneous-offense evidence. And as the State points out, Gia is the daughter shared by both Gadsden and Heidi.

18

Gadsden also asserts that the State did not have a great need for the extraneous-offense evidence because there was physical evidence of Heidi's injuries. While it is true that the State presented photographs of Heidi's bruises and that Heidi's sister testified to seeing the bruises firsthand, Gadsden told the jury that the bruises were caused by his grabbing her out of necessity. With the cause of Heidi's "evident injuries" in dispute, the State had a strong need for the extraneous-offense evidence, especially because Heidi's credibility was at issue. *See James*, 623 S.W.3d at 548. Indeed, the State did not actually have "other compelling or *undisputed* evidence to establish" what the extraneous-offense evidence was offered to prove—that is, the nature of Gadsden and Heidi's relationship. *See Gigliobianco*, 210 S.W.3d at 641 (emphasis added); *cf. Upchurch*, 656 S.W.3d at 179–80 (distinguishing *James*, 523 S.W.3d at 548).

These two factors weigh in favor of admission.

### b. Tendency of the Evidence to Suggest a Decision on an Improper Basis

Unfair prejudice "refers to a tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Gigliobianco*, 210 S.W.3d at 641. However, evidence is not excludable under Rule 403 if it is merely prejudicial, as "all evidence against a defendant is . . . designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *see* Tex. R. Evid. 403. Rule 403 is thus concerned with evidence that is *unfairly* prejudicial. *Pawlak*, 420 S.W.3d at 811.

Gadsden argues that the evidence was highly prejudicial. Specifically, he contends the evidence that he threatened to end adoption proceedings or to have Gia deported portrayed him as "cruel and cold-hearted," as well as the evidence of his controlling behavior and prior physical abuse, which would likely prevent the jury from evaluating the evidence "dispassionately." "When the extraneous offense is no more heinous than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice." *Norwood v. State*, No. 03-13-00230-CR, 2014 WL 4058820, at *5 (Tex. App.—Austin Aug. 15, 2014, pet. ref'd) (mem. op., not designated for publication). The complained-of evidence showed the nature of the relationship between Gadsden and Heidi, including the tactics he used to exert power and control over her. That evidence, while prejudicial, was not unfairly so. *See James*, 623 S.W.3d at 549; *Norwood*, 2014 WL 4058820, at *5; *cf. Upchurch*, 656 S.W.3d at 180 (holding factor weighed in favor of defendant when complained-of evidence involved "horrific" and "inflammatory" facts related to aggravated assault by fire).

Gadsden acknowledges that extraneous-offense evidence inherently carries the risk that a jury will convict on an improper basis of character conformity. When the evidence does tend to suggest a decision on an improper basis, a limiting instruction can minimize the risk of the jury improperly relying on it in reaching its verdict. *James*, 623 S.W.3d at 549; *Flores v. State*, No. 03-19-00489-CR, 2020 WL 3887976, at *4 (Tex. App.—Austin July 9, 2020, no pet.) (mem. op., not designated for publication). Gadsden argues, however, that because the trial court did not give a limiting

20

instruction when the evidence came in, there was an enhanced risk that the jury would consider the evidence as character-conformity evidence and give it undue weight. However, Gadsden cites no authority requiring the trial court to give the limiting instruction multiple times. The trial court included a written limiting instruction in its jury charge. We presume that the jury followed the trial court's limiting instruction. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *James*, 623 S.W.3d at 549. Gadsden does not attempt to rebut this presumption. *See Thrift*, 176 S.W.3d at 224.

Accordingly, we hold that this third factor weighs in favor of admission.

### c. Tendency of the Evidence to Confuse or Mislead the Jury

Confusion of the issues alludes to the likelihood that the evidence would confuse the jury or distract it from the case's central issues. *Gigliobianco*, 210 S.W.3d at 641. "Evidence that consumes an inordinate amount of time to present . . . might tend to confuse or distract the jury . . . ." *Id.* Misleading the jury refers to a tendency of an item of evidence to be given undue weight by the jury. *Id.*

Gadsden argues that the complained-of evidence distracted the jury from the main issue. According to Gadsden, this was "a simple he-said, she-said case," and the jury could have determined "whether to believe [Heidi's] story that [Gadsden] punched her or Gadsden's story that he grabbed her" without the complained-of evidence. The State contends the evidence did not confuse or distract the jury but rather provided a better picture of the cycle of violence between Gadsden and Heidi, which helped to explain Heidi's actions on the day of the assault. Further, the

evidence consumed a large portion of Heidi's testimony only because it was intertwined with the history of Gadsden and Heidi's marriage and Gia's adoption. And the State argues that the evidence was not scientific or complex but instead came in the form of Heidi's testimony as a lay witness. We agree with the State. *See Upchurch*, 656 S.W.3d at 181; *James*, 623 S.W.3d at 550; *Emich*, 2019 WL 311153, at *7.

Gadsden was arraigned on the charges in the jury's presence. The trial court issued a written limiting instruction prescribing how the jury should use the extraneous-offense evidence, if at all. Moreover, the jury charge and verdict forms made clear that the jury's job was to determine whether Gadsden was guilty or not guilty of the charged offense. We hold that these factors weigh in favor of admission.

### d. Likelihood of Undue Delay and Needless Repetition

This factor focuses on how efficient the trial is and not on the risk of an erroneous verdict. *Gigliobianco*, 210 S.W.3d at 641. Heidi was the only witness to testify to the extraneous-offense evidence, and the length of the testimony was related to the history of Gadsden and Heidi's marriage and Gia's adoption. Moreover, Gadsden concedes that this factor does not weigh against admissibility of the evidence or that it does so only slightly. We agree.

### e. Resolution

Balancing all six factors, we hold that the trial court did not abuse its discretion by determining that the probative value of the extraneous-offense evidence was not substantially outweighed by the risk of "unfair prejudice, confusing the issues,

misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403; *see James*, 623 S.W.3d at 551; *Flores*, 2020 WL 3887976, at \*5. All the *Gigliobianco* factors favor admission of the extraneous-offense evidence. *See* 210 S.W.3d at 641–42. The probative value of the evidence was high because it rebutted Gadsden's theory of necessity and showed the nature of Gadsden's abusive relationship with Heidi. It helped the jury understand why Heidi did not immediately report the November 5, 2019 assault, why she had not reported any of Gadsden's past abusive conduct, and why she had stayed with Gadsden. *See id.* It also helped the jury understand Gadsden's motive for the assault and his abusive behavior and explained an otherwise isolated incident or outburst of violence. For the same reasons, and because Heidi's credibility was implicitly at issue, the State's need for the evidence was high.

Gadsden failed to meet his burden of proof to establish that the evidence confused or misled the jury. The extraneous-offense evidence was not unduly prejudicial, and the trial court's limiting instruction sufficiently diminished the risk that the evidence had the potential to sway the jury to improperly convict Gadsden based on character conformity. We overrule Gadsden's first point of error.

## C. Admissibility of Expert Testimony and Exhibits

In his second point of error, Gadsden contends that the trial court abused its discretion by allowing the State to present Hensley's expert testimony and exhibits related to the dynamics of domestic violence because the evidence was not sufficiently tied to the facts of the case to be relevant to aid in the jury's decision. The State

argues that, because Gadsden did not raise this specific objection in the trial court, the point of error is unpreserved for our appellate review. Assuming, without deciding, that Gadsden's second point of error is preserved for appellate review, we hold that the trial court did not abuse its discretion by admitting Hensley's expert testimony and the accompanying exhibits.

### 1. Applicable Law

Rule 702 governs the admissibility of expert testimony. Tex. R. Evid. 702. Under Rule 702, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may "testify in the form of an opinion or otherwise if [her] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Thus, expert testimony may be admitted only if (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the testimony's subject matter is appropriate for expert testimony; and (3) admitting the expert testimony will aid the factfinder in deciding the case. *Rhomer*, 569 S.W.3d at 669. These conditions are known as (1) qualification, (2) reliability, and (3) relevance. *Id.* On appeal, Gadsden challenges only relevance.

### 2. Relevance of the Expert Testimony

Gadsden argues that Hensley's testimony about the dynamics of domestic violence was not relevant because this case was straightforward and because the

testimony covered dynamics of abuse not tied to the facts of this case or applicable to Gadsden and Heidi's relationship.

At Gadsden's trial, Hensley testified as follows about domestic violence, the cycle of violence, and the power-and-control wheel:

- Domestic violence involves power and control.

- Abuse is rooted in power and control.

- Abusers use physical and sexual abuse, emotional abuse, intimidation, coercion, threats, isolation, male privilege, minimizing, denial, blame, and even their children to maintain power and control.

- The power-and-control wheel is a tool used to demonstrate domestic violence.

- The center of the wheel is power and control, and each spoke of the wheel represents the different tactics used by abusers to exert power and control over their partner in the relationship.

- The abuser in an abusive relationship may threaten to take children away from the victim or use immigration issues to exert power and control.

- Emotional abuse includes name-calling, making the victim feel worthless, and making the victim feel like the abuse is their fault.

- Coercion involves getting the victim to do something she may not want to do by using threats, including, for example, threatening the victim that she would be charged with kidnapping if she left with a child.

- Isolation limits a victim's ability to leave the relationship.

- Abusers may require the victim to seek permission to use money, which is a common tactic used to exert power and control.

- Many victims describe their abuser as having strict, rigid beliefs about gender roles in their relationship in which the abuser is the master of the

castle and the victim's role is to be submissive and to care for the children in the home.

- The cycle of violence consists of a circular pattern of three phases: tension building, explosion or violence, and honeymoon.

- The cycle repeats over time and can look different throughout the same relationship over time.

- A complete cycle can occur in a day or may take years to complete.

- During the honeymoon phase, the abuser may apologize and promise to change, which gives the victim a sense of false hope.

- The victim of domestic violence is often fearful and typically does whatever she can to just maintain peace in their relationship.

- It is common for victims of domestic violence to choose to not report abuse to the police out of fear of retaliation by the abuser.

- There are common traits that occur in most domestic-violence relationships.

The testimony was relevant. "The average juror will not typically be familiar with the effect of domestic violence on victims and the dynamics of the relationship between an abuser and victim." *James*, 623 S.W.3d at 554 (citing *Fernandez v. State*, No. 02-18-00483-CR, 2020 WL 1057323, at *4 (Tex. App.—Fort Worth Mar. 5, 2020, pet. ref'd) (mem. op., not designated for publication)). And Gadsden concedes that the cycle of violence and the power-and-control wheel are generally accepted terms and tools used by experts to explain the domestic-violence relationship.

While the expert "must make an effort to tie pertinent facts of the case to the scientific principles [that] are the subject of [her] testimony," hypothetical facts that

"mirror" or "parallel" the facts of the case are sufficient. *Tillman v. State*, 354 S.W.3d 425, 438–39 (Tex. Crim. App. 2011). Here, several hypotheticals to which Hensley applied her theories and opinions mirrored the facts of this case. For example, one hypothetical in which Hensley explained that an abuser may threaten to take a child away or use immigration issues to exert power and control over the victim mirrored Heidi's experiences with Gadsden's threats that he would stop Gia's adoption, which would interfere with Gia's immigration, and that Gia would be deported. Similarly, Hensley's testimony that an abuser may threaten to report the victim for kidnapping as a coercion tactic parallels Gadsden's threats to accuse Heidi of kidnapping Gia. Several other hypotheticals paralleled the emotional abuse that Heidi described, such as Gadsden's name-calling, cursing at her, twisting things around, and making her feel like the abuse was her fault because, for example, she had scratched his car mirror or had ignored his phone calls.

Further, Hensley's testimony describing an abuser's strict, rigid ideas that there are gender roles in the relationship and that the victim's role is to be submissive is identical to Heidi's role in her relationship with Gadsden, including his getting angry with her for not doing his laundry, his forcing her to perform sexual acts and "wear things," and her ultimately becoming his "servant." Other examples where Hensley's testimony describing the common traits of a domestic-violence relationship mirrors the facts of this case include Gadsden's control over Heidi's access to money, Heidi's isolation while she lived in Mexico with Gadsden and Gia, Gadsden's abusive phone

27

calls and text messages, Heidi's fear, and Gadsden's apology and promise to "pay for it for the rest of [his] life." Thus, Hensley's testimony was sufficiently tied to the facts of this case. *See id.*

While we agree with Gadsden to the extent that Heidi's testimony did not identify every aspect of power and control or describe in great detail each phase of the cycle of violence, we do not agree that such testimony was required for Hensley's expert testimony to be relevant. Rule 702 requires that an expert's testimony "take into account *enough* of the pertinent facts to be of assistance to the trier of fact." *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996) (emphasis added). Hensley's testimony was sufficiently tied to the facts of the case to meet the simple requirement that it be "helpful" to the jury. *See id.* Indeed, "[t]hat some facts were not taken into account by the expert is a matter of weight and credibility, not admissibility." *Id.* Similarly, that Heidi's testimony about her relationship with Gadsden did not incorporate every "topic" of Hensley's testimony on the dynamics of domestic violence is a matter of weight and credibility, not admissibility. *See id.*

Hensley's testimony was relevant to help the average juror understand the dynamics of the relationship between Gadsden and Heidi, why Heidi would stay in an abusive relationship for so many years, why she had not reported any of his past abusive conduct, and why she did not immediately report the November 5, 2019 assault. For all these reasons, the trial court did not abuse its discretion by allowing

28

Hensley's expert testimony. *See James*, 623 S.W.3d at 555. We overrule Gadsden's second point of error.

## III. Conclusion

Having overruled Gadsden's two points of error, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 23, 2023